UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 22-CR-218 (TJK) |
| : | |
| EMERSON AGUIRRE-MORALES, : | |
| a.k.a. "Mota," : | |
| : | |
| Defendant. : | |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. For the reasons herein, the United States requests that the Court sentence Defendant Emerson Aguirre-Morales (hereinafter, "the defendant" or "Defendant Aguirre-Morales") to a period of 10 years' incarceration on the count of conviction.

**I.   FACTUAL AND PROCEDURAL BACKGROUND**

   A.   Background on 18th Street

18th Street is a transnational criminal street gang that originated in Los Angeles, California in the 1960s among immigrant populations in the prison system, spread to Central America during the following decades, and ultimately expanded into urban and suburban areas of the United States thereafter. Currently, the 18th Street gang has vast membership and is responsible for thousands of deaths in the United States and Central America. 18th Street members are required to commit acts of violence to further the gang's interests. These violent acts are often directed against rival gang members, typically members of *Mara Salvatrucha 13* ("MS-13"); fellow 18th Street members who violate gang rules or otherwise disrespect the gang; and individuals suspected of cooperating with law enforcement. Additionally, 18th Street members are known to sell and

1

transport narcotics, weapons, and other contraband to generate money for the gang and its criminal activities. Some of the proceeds are then wired to members of the gang's leadership in other countries, namely El Salvador and Guatemala.

18th Street is highly organized and well-structured. In the Central American countries where 18th Street is strongest, most notably El Salvador, 18th Street is divided into two main factions that are often at open war with one another—the *Surenos* and the *Revolucionarios*. Within those factions, 18th Street members are organized into "cliques," or smaller groups operating within specific cities or regions that are all subject to the umbrella rules of 18th Street. Members must follow initiation rituals; use specific gang signs, colors, and symbols; adhere to and enforce specific rules of conduct; and pay dues that are used, in part, to support the gang and its members.

18th Street members and associates use certain terms to describe the gang's organizational structure and certain positions within the gang, including but not limited to the following: A "Homeboy" is a full-fledged member who has been "jumped in" to the gang after proving his loyalty and worth to the other Homeboys. Being "jumped in" usually entails an 18-second physical beating from other Homeboys. A "*Civil*," or helper, serves as a "lookout" who alerts Homeboys to the presence of law enforcement or rival gangs in the neighborhood, delivers narcotics, drives Homeboys, and offers other assistance to the gang. Homeboys receive approval from 18th Street's senior leadership to "jump in" a *Civil* and promote him to a Homeboy based on the *Civil*'s benefit to the gang. A "*Palabrero*" or "First Word" is a senior Homeboy and leader who commands a clique and can order gang members to commit acts of violence, including murder, kidnapping, assault, and robbery. The "Second Word" is also a senior Homeboy who is second in command within the clique.

In May 2019, the FBI, with other law enforcement agencies, began a large-scale investigation into 18th Street in the DMV area. Given the closed-off, insular nature of the gang as well as the extreme reluctance of victims and witnesses to report crimes committed by the gang, law enforcement necessarily utilized confidential informants and government cooperators. Through this and other investigative techniques, law enforcement uncovered evidence of local 18th Street cliques—namely, Tiny Locos Sureños ("TLS") and Los Crazy Brothers ("LCB")—committing multiple murders, attempted murders, kidnappings, and robberies, in addition to trafficking firearms and narcotics throughout the area. The defendant was one of the TLS Homeboys identified through the investigation.

B.      Procedural Background on the Defendant

On June 17, 2022, the defendant was charged as a juvenile by criminal Information with numerous offenses relating to his involvement in the 18th Street gang. In particular, the defendant was alleged to be a member of a particular 18th Street clique[1] gang operating in and around the D.C.-metro area, TLS. Central to the Information's charges was a shooting committed on May 21, 2021, by the defendant and another 18th Street gang member identified as Jexon Madrid-Flores (hereinafter, "Madrid-Flores"). Prior to the shooting, the defendant and Madrid-Flores confronted and brandished firearms at the victim of the shooting outside a tobacco and vape store in the Columbia Heights neighborhood of D.C. as they suspected that the victim was a member of a rival gang. Following the initial confrontation, the defendant and Madrid-Flores drove up 14th Street NW in pursuit of the victim, who was riding his bicycle. The defendant and Madrid-Flores

---

[1] As specified in the Information, members of 18th Street are organized into "cliques," or smaller groups operating within specific cities or regions that all operate under the umbrella rules of 18th Street. The defendant was an alleged member of the Tiny Locos Surenos ("TLS") clique operating in Washington, DC.

3

eventually caught up to the victim, and the defendant shot the victim in the knee while he was riding his bicycle before the defendant fled the scene with Madrid-Flores. The defendant was charged in Count 1 with Violent Crime in Aid of Racketeering-Assault with a Dangerous Weapon, in violation of 18 U.S.C. § 1959(a)(3); Count 2, Using, Carrying, Possessing, Brandishing, and Discharging a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii); Count 3, Violent Crime in Aid of Racketeering-Attempted Murder, in violation of 18 U.S.C. § 1959(a)(5); Count 4, Using, Carrying, Possessing, Brandishing, and Discharging a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); Count 5, Assault With Intent to Kill While Armed, in violation of 22 D.C. Code §§ 401, 4502; Count 6, Aggravated Assault While Armed, in violation of 22 D.C. Code §§ 401.01, 4502; Count 7, Carrying a Pistol Without a License, in violation of 22 D.C. Code §§ 4504(a); and Count 8, Unlawful Possession of a Handgun by a Juvenile, in violation of 18 U.S.C. § 922(x).

On July 27, 2022, the government filed a Motion to Transfer Proceedings Against Juvenile to Adult Criminal Prosecution pursuant to 18 U.S.C. § 5032. *See* ECF No. 5. From November 9, 2023, to December 14, 2023, this Court held hearings on the government's Motion to Transfer Proceedings Against Juvenile to Adult Criminal Prosecution. Prior to the Court issuing a ruling on the government's Motion, the defendant accepted and signed a plea offer, agreeing to waive further juvenile transfer proceedings and plead guilty as an adult to a Superseding Criminal Information. *See* ECF Nos. 33 & 35. As part of the plea agreement, the defendant pled guilty to one count of Violent Crime in Aid of Racketeering-Attempted Murder, in violation of 18 U.S.C. § 1959(a)(5), in exchange for dismissal of the remaining counts of the Information previously filed as well as a dismissal of District of Columbia Superior Court case number 2021 CF1 003680 at

4

the time of sentencing. *See* ECF No. 35. In support of the plea, the United States and the defendant offered the following factual proffer:

> On or about May 21, 2021, the defendant Emerson Aguirre-Morales (hereinafter "Aguirre-Morales") was a member or associate of the international criminal street gang known as "18th Street." The 18th Street gang engages in a variety of criminal activities to include acts of assault, robbery, kidnapping, murder, and firearms trafficking in the District of Columbia and other jurisdictions, both within the United States and in foreign countries. 18th Street members are required to commit acts of violence to further the interests of the gang. These violent acts are often directed against rival gang members, 18th Street members who have violated gang rules or have otherwise disrespected the gang, and people who are suspected of cooperating with law enforcement. Additionally, 18th Street members are also known to possess, sell and transport narcotics, weapons, and other contraband to generate money to support the gang and its criminal activities both within the District of Columbia and across state lines. Some of the proceeds of this criminal activity are wired to members of the gang's leadership in foreign countries. 18th Street members are known to control geographical areas and use violence to maintain their control. 18th Street consists of an enterprise that engages in racketeering activity.
>
> On or about May 21, 2021, Aguirre-Morales followed the victim, C.H. (hereinafter "the victim") in a vehicle to the 5700 block of 14th Street NW, Washington, DC along with an associate. Aguirre-Morales, who was a passenger in the vehicle, and the associate followed the victim for the purpose of murdering him because he was a perceived member of a rival gang known as MS-13.
>
> Upon catching up with the victim, who was on a bicycle, Aguirre-Morales fired multiple gunshots at the victim from the passenger seat of the vehicle he was in. The victim was hit once in the leg, which caused serious bodily injury. Following the shooting, Aguirre-Morales and his associate drove away from the scene.
>
> At the time he committed the shooting, Aguirre-Morales was a member or associate of the 18th Street gang, and a purpose in committing the attempted murder was to maintain or increase his position within the 18th Street gang, and that was one of the reasons he participated in the attempted murder.

*See* ECF No. 36. As the Statement of Offense makes clear, the above factual proffer is not intended to be an all-encompassing summation of the available evidence of the defendant's guilt as to the count of conviction, but rather a minimum statement of facts intended to provide the necessary factual predicate for the guilty plea. *See id.*

5

## II.   DISCUSSION AND APPLICATION OF U.S. SENTENCING GUIDELINES AND 3553(a) FACTORS

A.   <u>Generally Applicable Legal Principles</u>

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). See *United States v. Gall*, 128 S. Ct. 586, 596 (2007). The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
>
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>>
>>> (i) issued by the Sentencing Commission ...; and
>>>
>>> (ii) that, . . . are in effect on the date the defendant is sentenced; ...
>
> (5) any pertinent policy statement –
>
>> (A) issued by the Sentencing Commission ... and

> (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

B.  Guidelines Calculations

Turning to 3553(a)(4)(A), the government concurs with the assessment of the United States Probation Office for the District of Columbia (hereinafter, "U.S. Probation") regarding the total offense level applicable in this case, the defendant's criminal history score, and the resulting range under the U.S. Sentencing Guidelines (hereinafter, "Guidelines" or "USSG").

1.  *Offense Level Calculation*

The government agrees that the Adjusted Offense Level for the count of conviction is 35. Under USSG § 2E1.3, given that the defendant has pled guilty to a violation of 18 U.S.C. § 1959(a), the Base Offense Level is the offense level applicable to the underlying crime or racketeering, which in this case would be attempted murder. Thus, the Base Offense Level would be 33. *See* USSG § 2A2.1. The government concurs that a two-level increase is warranted pursuant to USSG § 2A2.1(b)(1)(B) as the victim in this case sustained serious bodily injury by virtue of being shot in the leg. Given that the defendant accepted responsibility in a timely fashion, he should receive a three-level reduction under USSG § 3E1.1, resulting in a Total Offense Level of 32.

2.  *Criminal History*

The government agrees that the defendant has accumulated one criminal history point, placing him in Criminal History Category I.

| Referral Date | Charge / Court | Disposition Date / Sentence | Scoring (USSG) |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 09/20/2019 | Possession of a Prohibited Weapon – Washington, DC<br><br>(2019 DEL 000895) | 3/18/2020 – Supervised Probation | 1 (USSG §§ 4A1.1(c) & 4A1.2(d)(2)(B)) |
| 01/09/2020 | Attempted Robbery While Armed – Washington, DC<br><br>(2020 DEL 000034) | 3/18/2020 – Supervised Probation | 0 (USSG §§ 4A1.1(c) & 4A1.2(a)(2)) |
| | | | 1 |

       3.     *USSG Range*

Under the Guidelines, at a Total Offense Level of 32, in Criminal History Category I, the defendant's range is 121 months' incarceration to 151 months' incarceration. However, as the PSR correctly points out, given that the statutorily authorized maximum sentence for this offense is less than the minimum of the applicable guideline range, the guideline sentence is 120 months. *See* USSG § 5G1.1(a).

       C.     <u>Sentencing Recommendation</u>

The government recommends that the Court sentence the defendant to 10 years' incarceration given the nature and seriousness of his offense; his history and characteristics; the need for the sentence imposed to satisfy the statutory requirements set forth in § 3553(a)(2)(A)-(D); his relative early acceptance of responsibility; the likelihood that this conviction will lead to deportation; and his age, maturity, and home life at the time of the offense. The government will discuss each of those factors in turn.

       1.     *Nature and Seriousness of the Offense*

The defendant was an active, high-ranking member within 18th Street and was dedicated to maintaining his rank within the gang by participating in its affairs and committing an attempted murder to enhance his own reputation within the gang and to facilitate the ascent up the gang's

8

ranks of his co-conspirator – Jexon Madrid-Flores. As described above and as the Court heard throughout the multi-day transfer hearing in the instant matter, the 18th Street gang poses a serious threat to public safety and the callousness of the attempted murder of the victim in this case exemplifies such gratuitous violence. This was a brazen, premeditated shooting in broad daylight on a residential street that warrants a severe sentence. The defendant and his co-conspirator Madrid-Flores confronted the victim earlier and then stalked him up 14th Street solely based upon the unverified belief that the victim was a rival gang member. The defendant then committed a drive-by shooting of the victim in broad daylight, resulting in significant injuries. Furthermore, given the location and time of the shooting, the defendant put other members of the public at serious risk of danger as well. The serious nature of the shooting committed by the defendant cannot be understated and will have a lasting impact on the victim both physically and emotionally.

      Moreover, this shooting was not an aberration in the defendant's young life. Rather, this was the culmination of what he had been working towards as a loyal servant of the gang – exterminating enemies, both actual and perceived. The defendant has admitted to being a member or associate of the 18th Street gang, which the Court has heard engages in numerous violent acts of racketeering. The defendant knew full well what was expected of him in order to maintain or increase his position in the gang, and chose to engage in the gang's activities, nonetheless. The defendant's active participation in the 18th Street gang that led to this attempted murder is certainly an aggravating circumstance that lends further seriousness to the nature and circumstance of the offenses to which he pled guilty.

Finally, as the Court heard throughout the transfer hearing, the defendant was no stranger to illegal firearms possession. Aside from the firearm used to shoot the victim in this case, the defendant was also found with a different firearm approximately one month later at his restaurant

job of all places.  *See Gov. Ex. #40[2] – Supplemental Gerstein*.  The firearm recovered from the defendant's satchel is depicted below and clearly shows that the serial number for the firearm has been removed:



*Gov. Ex. #45 – Gun (SERIAL side) mota arrest*

In addition, as the Court heard, the vehicle used in the commission of the attempted murder was found about a month-and-a-half later and was subject to an executed search warrant.  Within the vehicle, the photograph shown below was recovered, which clearly shows the defendant and his co-conspirator Madrid-Flores brandishing firearms at the camera:

---

[2] The government's exhibits were introduced into evidence before the Court at prior hearings in this case.  The government has retained the original exhibit numbering and naming conventions for consistency purposes.

10



*Gov. Ex. #34 – Buick Photograph*

The defendant's continued possession of firearms is extremely concerning given his age, juvenile delinquency history, and gang affiliation. All these circumstances surrounding the offense and defendant warrant a significant sentence.

    2.    *Defendant's History and Characteristics*

First and foremost, the defendant's most pertinent history and characteristics stem from his membership of the TLS clique of 18th Street in Washington, D.C. The defendant certainly has been exposed to violence since an early age ever since his upbringing in El Salvador. *See* Presentence Investigation Report ("PSR") ¶¶ 68, 78. Violent surroundings apparently continued to follow him upon his immigration to the United States. *Id.* at ¶¶ 70, 76. However, by all

accounts, the defendant had a good relationship with his family growing up. *Id.* at ¶¶ 68, 70-71, 78a. As such, while the defendant's violent neighborhood conditions growing up may help contextualize his eventual gang involvement, they do not excuse or justify his continued participation in a violent criminal street gang for an extended period of time. In addition, the defendant has apparently been able to maintain relatively steady legitimate employment. *Id.* at ¶¶ 96-98. Therefore, the defendant at least had some positive outlets he was engaged in that could have kept him away from ongoing criminal activity. While the PSR indicated he has had certain personal struggles, *see* PSR at ¶¶ 85-92, there is no indication in the PSR that these issues precipitated his membership in the gang and offenses committed at its behest.

The government acknowledges that the defendant was very young at the time he committed this offense, *i.e.*, 17 years' old at the time of the attempted murder. However, the defendant was merely a day away from his 18th birthday when he committed the drive-by shooting of the victim in this case. Furthermore, the defendant was no stranger to the justice system prior to this offense, as indicated by his Criminal History. As described above, the defendant has also possessed numerous firearms despite his young age, which suggest a predisposition to violence. The fact that the defendant brought a firearm to his place of employment after the shooting in this case demonstrates extremely reckless and poor decision-making that suggests a lengthy period of incarceration is necessary to protect the community. Lastly, while the defendant did accept responsibility in this case, he did initially force the government to proceed with a full transfer hearing that somewhat undercuts the early nature of his acceptance of responsibility.

      3.    *Need for the Sentence Imposed*

The government believes that its proposed sentence of 10 years' incarceration[3] will best effectuate the purposes of sentencing as set forth in 3553(a)(2)(A)-(D), that is, for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; afford adequate deterrence of criminal conduct; protect the public from further crimes of the defendant; and allow the defendant with training, treatment, and other type of care he may require.

Here, the defendant is a member of a transnational criminal street gang which is devoted to perpetrating violence against all threats, such as suspected rival MS-13 members. As part of the requirements of maintaining or increasing his status in the gang, he was required to commit acts of violence to include attempted murder against suspected rival gang members. Indeed, the defendant shot the victim in this case due to his belief that the victim was a rival MS-13 member. A period of 10 years' incarceration would not only reflect the seriousness of the defendant's criminal conduct, but would also serve as a deterrent, both specifically to the defendant, but also to similarly situated gang members currently in the community. Such a sentence demonstrates the inordinately high cost of involving oneself in a criminal enterprise that is seemingly single-mindedly devoted to violence and control and the seriousness of injuring others at the behest of the gang, while still taking into account any and all arguable mitigating circumstances applicable in the defendant's situation.

---

[3] The government is not recommending a period of supervised release because the defendant is an illegal alien and will likely be deported upon completion of his carceral sentence. *See* 5D1.1(c) ("The court ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment."). 18 U.S.C. § 1963 does not specify a mandatory term of supervised release for violations of § 1962.

## III. CONCLUSION

WHEREFORE, for the foregoing reasons, the Court should sentence the defendant to a total of 10 years' incarceration. Such a sentence would be sufficient but not greater than necessary to achieve the purposes of sentencing.

                                          Respectfully submitted,

                                          MATTHEW M. GRAVES
                                          UNITED STATES ATTORNEY
                                          D.C. Bar No. 481052

By:   /s/ *John Korba*
          JOHN F. KORBA
          WILL HART
          SITARA WITANACHCHI
          Assistant United States Attorneys
          U.S. Attorney's Office for the
          District   of Columbia
          D.C. Bar No. 1010303 (Korba)
          D.C. Bar No. 1029325 (Hart)
          D.C. Bar No. 1023007 (Witanachchi)
          601 D. St., N.W.,
          Washington, D.C. 20530